ECO-SITE, INC. and T-MOBILE
NORTHEAST LLC,
     Plaintiffs,


     v.                               CIVIL ACTION NO.
                                        17-10304-MBB

THE TOWN OF WILMINGTON,
THE TOWN OF WILMINGTON
ZONING BOARD OF APPEALS; and
EDWARD LOUD, DANIEL VEERMAN,
ANTHONY BARLETTA, THOMAS
SIRACUSA, and JACQUELYN
SANTINI, in their Capacities
as members of the Town of
Wilmington Zoning Board of
Appeals,
     Defendants.


**MEMORANDUM AND ORDER RE:**
**PLAINTIFFS ECO-SITE II, LLC AND T-MOBILE NORTHEAST LLC'S MOTION**
**FOR SUMMARY JUDGMENT (DOCKET ENTRY # 41)**

**March 25, 2019**

**BOWLER, U.S.M.J.**

Pending before this court is a motion for summary judgment

filed by plaintiffs Eco-Site II, LLC ("Eco-Site") and T-Mobile

Northeast LLC ("T-Mobile") (collectively "plaintiffs"). (Docket

Entry # 41). Defendants the Town of Wilmington ("the Town"),

the Town of Wilmington Zoning Board of Appeals ("the Board"),

Edward Loud ("Board Member Loud"), Daniel Veerman ("Board Member

Veerman"), Anthony Barletta ("Board Member Barletta"), Thomas

Siracusa ("Board Member Siracusa"), and Jacquelyn Santini

("Board Member Santini") (collectively "defendants") oppose the motion. (Docket Entry # 49). After conducting a hearing, this court took the motion (Docket Entry # 41) under advisement.

PROCEDURAL HISTORY

Plaintiffs filed this action on February 23, 2017, challenging the Board's denial of their application for dimensional variances and a special permit under the Town's Zoning Bylaw to construct a wireless telecommunications facility at a designated property in the Town. (Docket Entry # 1). "Plaintiffs seek an order from this court directing the Board to grant Plaintiffs' requests for zoning relief in accordance with their rights under the" federal Telecommunications Act of 1996 ("the TCA"), 47 U.S.C. § 332(c) ("section 332(c)"). (Docket Entry # 1, p. 2). Specifically, they assert that the Board's denial violates section 332(c)(7)(B) of the TCA because it: (1) is not supported by substantial evidence; and (2) effectively prohibits T-Mobile from providing personal wireless service. (Docket Entry # 42, p. 6).

Defendants oppose the summary judgment motion and request "disposition on their behalf in accordance with the" TCA, Massachusetts General Laws chapter 40A ("the Massachusetts Zoning Act"), and Federal Rule of Civil Procedure 56(f)(1) ("Rule 56(f)(1)") and 56(f)(3) ("Rule 56(f)(3)"). (Docket Entry

# 46, p. 3). Defendants did not file a cross motion for summary judgment. Defendants contend that the Board's decision is supported by substantial evidence in the written record and that neither the Town's Zoning Bylaw nor the Board's decision constitute an "'effective prohibition'" under the TCA because it does not prohibit cell towers within the Town. (Docket Entry # 46, p. 3). Principally, they argue that notwithstanding the TCA, the Board's denial is in accordance with the Town's Zoning Bylaw, as allowed by the Massachusetts Zoning Act. (Docket Entry # 46, pp. 4-5).

## STANDARD OF REVIEW

Summary judgment is designed "'to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'" Davila v. Corporación De Puerto Rico Para La Difusión Pública, 498 F.3d 9, 12 (1st Cir. 2007) (internal citations omitted). It is appropriate when the summary judgment record shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "'A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party.'" American Steel Erectors, Inc. v. Local Union No. 7, Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers, 536 F.3d 68, 75 (1st Cir. 2008) (internal citation omitted).

"'A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law.'" Id. (internal citation omitted).

Facts are viewed in favor of the non-movant, i.e., defendants, and resolved in their favor. See Jones v. City of Boston, 845 F.3d 28, 32 (1st Cir. 2016) ("district court was required to assume that any disputes of material fact-including conflicting opinions offered by competent experts—could be resolved by the jury in the Officers' favor"). Plaintiffs submit a LR. 56.1 statement of undisputed facts. Uncontroverted statements of fact in the LR. 56.1 statement comprise part of the summary judgment record. LR. 56.1; Cochran v. Quest Software, Inc., 328 F.3d 1, 12 (1st Cir. 2003) (the plaintiff's failure to contest date in LR. 56.1 statement of material facts caused date to be admitted on summary judgment); Stonkus v. City of Brockton Sch. Dep't, 322 F.3d 97, 102 (1st Cir. 2003).

### FACTUAL BACKGROUND

"T-Mobile provides wireless telecommunications services pursuant to licenses issued by the Federal Communications Commission" ("FCC"). (Docket Entry # 43, ¶ 2) (Docket Entry # 45, p. 2). "To provide its services, T-Mobile must deploy a network of interrelated 'cell sites' that must overlap in a grid pattern, and must provide adequate signal strength and network capacity." (Docket Entry # 43, ¶ 3) (Docket Entry # 45, p. 2).

"Eco-Site is in the business of developing telecommunication towers" that allow wireless carriers, such as T-Mobile, to create and maintain their network of cell sites. (Docket Entry # 43-2, p. 12).

Based on research and analysis by radio frequency ("RF") engineers, T-Mobile determined "that it has a significant gap in its ability to provide service in the Town . . . in the vicinity of Tacoma Drive . . . caused by a lack of reliable in-building residential and commercial coverage."[1] (Docket Entry # 43, ¶¶ 14-15) (Docket Entry, # 45, p. 5). The coverage gap at a 2100 MHz frequency spans approximately 2.1 square miles. (Docket Entry # 43, ¶¶ 9, 11, 18) (Docket Entry # 45, pp. 4, 6) (Docket Entry, # 43-1, ¶ 7, 18). "The gap in coverage includes residences, commercial buildings, and strip malls within a boundary composed of I-93, Middlesex Avenue, Salem Street, Lawrence Street, Shady Lane Drive, and Concord Street." (Docket

---

[1] Plaintiffs rely primarily on the expert report of Richard Conroy ("Conroy"), an RF engineer, submitted in support of the motion for summary judgment ("the Conroy Report"). (Docket Entry # 43-1). The Conroy Report purports to show, using "calculated propagation maps" and "key system performance data" ("KPI Data"), that T-Mobile has a "significant gap in reliable wireless service" in the vicinity of Tacoma Drive. (Docket Entry # 43-1) (capitalization omitted). Plaintiffs also submitted to the Board an affidavit prepared by Ryan Monte de Ramos ("Monte de Ramos"), an RF engineer for T-Mobile, that states, among other things, that T-Mobile "provides insufficient wireless communication service" to the Town in the vicinity of Tacoma Drive ("the RF Affidavit"). (Docket Entry # 43-2, p. 46).

Entry # 43, ¶ 19) (Docket Entry, # 45, p. 6) (Docket Entry, # 43-1, ¶ 19).  "According to 2010 U.S. Census data, there are approximately 2,320 to 5,494 residents in the in-building coverage gap area."  (Docket Entry # 43, ¶ 20) (Docket Entry # 45, p. 7) (Docket Entry, # 43-1, ¶ 19).

In light of the gap, T-Mobile's RF engineers identified a search area ("the search ring") in the vicinity of Tacoma Drive which needed a new wireless telecommunications facility to remedy the service gap.  (Docket Entry # 43, ¶ 21) (Docket Entry # 45, p. 7).  The search ring "consisted mostly of single-family homes, an industrial area, single story retail stores with accompanying parking lots, a school, fresh water ponds, and conservation land."  (Docket Entry # 43, ¶ 24) (Docket Entry # 45, p. 8).  The parties agree that "[a]n appropriate candidate within the search ring must be able to work within T-Mobile's existing network to remedy the service gap, comply with local zoning requirements, hav[e] a willing landlord, and be buildable."  (Docket Entry # 43, ¶ 26) (Docket Entry # 45, p. 8).

"Plaintiffs performed a detailed and thorough search of the area within the search ring for available properties that would be suitable for construction of a wireless telecommunications facility" and "worked to find a site . . . that complied with the Town's local zoning bylaws."  (Docket Entry # 43, ¶¶ 23, 27)

6

(Docket Entry # 45, pp. 7-9). An unsigned affidavit purportedly prepared by a "Site Acquisition Specialist" on behalf of plaintiffs identifies four separate locations within the search ring that were considered and ultimately rejected: "St. Dorothy's Church," "200 Jefferson Road," Town-owned land ("Town Hall"), and the "Anderson property."[2] (Docket Entry # 43-2, p. 41).

The Town Hall, although a permitted location under the Town's Zoning Bylaw, "was not an appropriate candidate because the Town refused to enter into a lease that would permit T-Mobile to deploy a wireless telecommunications facility at the" location. (Docket Entry # 43, ¶¶ 28-29) (Docket Entry # 45, p. 9). Although St. Dorothy's "Church is [within] a residential zone, the Town's bylaws [] permit construction so long as the

---

[2] The unsigned affidavit is part of an application Eco-Site submitted to the Board for the special permit and variances at issue. The "Site Acquisition Specialist" identifies himself as Timothy Greene ("Greene") at the beginning of the report, but the signature line at the end of the report contains a different name and is not signed. (Docket Entry # 43-2, pp. 39-42). Defendants' argument that the unsigned affidavit lacks a foundation is well taken. (Docket Entry # 45, p. 8). Defendants, however, admit that the application Eco-Site filed on November 15, 2016 with the Town ("the Application") contained the affidavit. (Docket Entry # 43, ¶ 62) (Docket Entry # 45, pp. 16-20) (Docket Entry # 43-2, pp. 39-42, 149-150). Accordingly, this court only considers the affidavit to the extent that it is in the administrative record as part of the Application Eco-Site filed with the Board. This court does *not* consider the unsigned affidavit when assessing the effective prohibition argument.

7

facility [is] deployed in the church steeple." (Docket Entry # 43, ¶ 31) (Docket Entry # 45, p. 10). However, the unsigned affidavit states that "[t]he existing steeple is too low to provide coverage."[3] (Docket Entry # 43-2, p. 41). Finally, "T-Mobile expressed interest in 200 Jefferson Road, a site that sits in a general business zone, and was being used to store old eighteen-wheelers at the time." (Docket Entry # 43, ¶ 34) (Docket Entry # 45, p. 10). The landlord of the property, however, "refused to lease the property." (Docket Entry # 43, ¶ 35) (Docket Entry # 45, p. 11).

After evaluating the properties within the search ring, T-Mobile determined that a property at 4 Waltham Street ("the Proposed Site") was an appropriate site because: "[i]t is located in a General Business Zone, it would provide coverage relative to its location, it is buildable, and the site owner agreed to lease the site."[4] (Docket Entry # 43, ¶ 40) (Docket

---

[3] The Conroy Report also concludes that St. Dorothy's Church "is not a viable option." (Docket Entry # 43-1, ¶ 33). Specifically, the Conroy Report notes:

> Assuming an antenna structure could be mounted in a fashion acceptable to the [Board], it would be at a height of approximately 50' above ground level. This is too low and within the tree line of the surrounding tree canopy to provide substantive coverage to the gap area.

(Docket Entry # 43-1, ¶ 32).

[4] As noted below, the Board rejected the location.

Entry # 45, p. 12).  The zoning location of the Proposed Site
does not prohibit a telecommunications facility.  (Docket Entry
# 43, ¶ 72) (Docket Entry # 45, p. 23).  On October 31, 2016,
plaintiffs entered into a lease with the owner of the Proposed
Site that permitted construction of a wireless
telecommunications facility.  (Docket Entry # 43, ¶ 42) (Docket
Entry # 45, p. 13).

As previously noted, "Eco-Site filed an Application for a
special permit for a wireless communication facility" with the
Town on November 15, 2016.  (Docket Entry # 43, ¶ 54) (Docket
Entry # 45, p. 16).  The Application "requested that the Town
grant Eco-Site a Special Permit, Site Plan Review, and specific
dimensional variances so that Eco-Site could construct a 120-
foot monopole style wireless tower at 4 Waltham Street" ("the
Proposed Facility").  (Docket Entry # 43, ¶ 55) (Docket Entry #
45, p. 17).

"The Application included detailed site plans for the
[Proposed Facility]; photographic simulations; an alternative
site analysis; an inventory of existing towers; an RF Affidavit;
T-Mobile's coverage maps; a Federal Airways & Airspace Report; a
fall zone letter ["the Fall Zone Letter"];[5] evidence of T-

---

[5]  The Fall Zone Letter is in the form of letter correspondence
addressed to Eco-Site and signed by "Brenden Alexander, P.E.,"
on behalf of Dewberry Engineers, Inc.  (Docket Entry # 43-2, p.
60).  As defendants point out, the Fall Zone Letter "is not in

Mobile's FCC licenses; a list of abutters to the [Proposed
Site]; and a Storm Water Pollution Prevention Plan prepared by
professional engineers." (Docket Entry # 43, ¶ 59) (Docket
Entry # 45, p. 18). The Fall Zone Letter states, among other
things:

> [T]owers can be specifically designed for a reduced fall
> zone so that if a catastrophic event results in an overload
> of the structure, it will yield at a specific height
> resulting in failure that allows the top section of the
> tower to collapse while the lower section remains upright.
> This type of design could reduce the fall zone by as much
> as half if properly designed. Using this type of tower[,]
> the tower fall zone could be designed to avoid the building
> on the northern abutting parcel (355), located
> approximately 120'+ feet from the tower location, as shown
> in revision c zoning drawings by Infinigy dated 10/31/16.

(Docket Entry # 43-2, p. 60).

Overall, the Application purported to demonstrate that
plaintiffs "were 'entitled to a Special Permit, Site Plan
Approval and Dimensional Variances[] because their proposal
satisfies the requirements set forth in Section 6.8.5, Section
10.5, Section, 10.6, and Section 6.5 of the [Town's Zoning]
Bylaw and [the Massachusetts Zoning Act] and the [TCA][.]'"
(Docket Entry # 43, ¶ 57). Specifically, the Application
states:

> [B]ecause the Bylaw restricts wireless facilities to the
> General Business (GB), General Industrial (GI) and Highway

---

the form of an affidavit and does not contain any attestation of
its veracity." As such, it simply evidences that it was part of
the Application which Eco-Site filed for the Board to consider.
(Docket Entry # 45, pp. 19-20).

Industrial (HI) districts, and further requires that wireless facilities be set back at least five hundred feet (500') from a residential building and setback from the property line by a distance equal to the height of the tower, the Town of Wilmington has effectively prohibited wireless facilities from certain areas of the Town. It is impossible for T-Mobile to provide reliable wireless coverage to the Town of Wilmington under the present zoning scheme without obtaining the requisite dimensional variances and zoning relief.

(Docket Entry # 43-2, p. 8).

The Application also contains statements arguing that the Town and its residents will "benefit from construction of the Proposed Facility because it will provide increasingly reliable wireless service with E911 enhanced emergency service, Global Positioning System ('GPS') technology, and will generally promote the safety and welfare" of "the Town [and] its residents, businesses, and drivers by providing reliable state-of-the-art digital wireless voice and data services." (Docket Entry # 45, p. 20) (Docket Entry # 43, ¶ 63).

A public hearing on the Application before the Board took place on January 17, 2017 ("the hearing"). (Docket Entry # 45, p. 20) (Docket Entry # 43, ¶ 64). Board members Loud, Veerman, Barletta, Siracusa, and Santini ("the board members") were present at the hearing. (Docket Entry # 48-1, p. 199). Ricardo Sousa, Esq. ("Sousa"), an attorney representing plaintiffs, gave a presentation about the Proposed Site and the Proposed Facility. (Docket Entry # 45, p. 22) (Docket Entry # 43, ¶ 68)

(Docket Entry # 48-1, pp. 201-203).  Monte De Ramos and Greene also spoke on behalf of plaintiffs.  (Docket Entry # 43, ¶ 69) (Docket Entry # 45, p. 22).  "Monte De Ramos, an RF Engineer, produced RF propagation maps demonstrating T-Mobile's existing network coverage and a propagation map depicting the anticipated coverage from the proposed facility."  (Docket Entry # 43, ¶ 70) (Docket Entry # 45, p. 22).  The Board did not conduct an independent analysis and "no contrary information concerning" the coverage gap "was presented at the hearing."  (Docket Entry # 45, p. 22).

Board Member "Loud asked if Plaintiffs had evaluated the Tewksbury Fire Department pole" ("the Tewksbury Fire Department Tower").  (Docket Entry # 45, p. 23) (Docket Entry # 43, ¶ 73) (Docket Entry # 48-1, p. 201).  The hearing minutes note that plaintiffs "had not" evaluated this location at the time of the hearing.[6]  (Docket Entry # 48-1, p. 201).  In addition, "Sousa

---

[6]  The minutes read:  "Edward Loud asked if they had checked into the pole in Tewksbury located at the Fire Station not far from the Wilmington line and it appeared that this might be the location to fill in the gap.  They had not."  (Docket Entry # 48-1, p. 201).  After the hearing, "T-Mobile considered the Tewksbury Fire Department Tower," which is one mile from the search ring, and concluded allegedly that the location would not remedy the coverage gap.  (Docket Entry # 45, p. 11) (Docket Entry # 43, ¶ 37).  Specifically, the Conroy Report states that "[t]he Tewksbury Fire Station is located approximately 1 mile from the search ring center" and therefore "is easily ruled out."  (Docket Entry # 43-1, ¶ 34).  In addition, the parties agree that because "T-Mobile is already operating from [an] existing site" across the street from the Tewksbury Fire

12

testified that Plaintiffs believed that the Town Hall was the ideal location for a facility to remedy the significant gap, but that the Town was not interested." (Docket Entry # 43, ¶ 74) (Docket Entry # 45, p. 23) (Docket Entry # 48-1, p. 201).

A number of abutters at the hearing expressed objections to the Application. (Docket Entry # 43, ¶ 75) (Docket Entry # 45, pp. 23-24) (Docket Entry # 48-1, p. 201). "Abutter Peter Reinhart stated that he did not see the need for a tower at the [Proposed] Site." (Docket Entry # 43, ¶ 76) (Docket Entry # 45, p. 24) (Docket Entry # 48-1, p. 201). "Abutter Paul Logan ("abutter Logan") was concerned that there was not a tree line to screen the proposed tower from his view." (Docket Entry # 43, ¶ 77) (Docket Entry # 45, p. 24) (Docket Entry # 48-1, p. 201). "Abutter Paul Kneeland submitted a memorandum opposing the Application because of the proximity to [the] railroad tracks." (Docket Entry # 43, ¶ 78) (Docket Entry # 45, p. 25). "Abutter Barbara Fitzgerald was opposed to the Application because she was 'concerned about excavating or building anything more on [the] site.'" (Docket Entry # 43, ¶ 79) (Docket Entry # 45, p. 25).

---

Department, any potential coverage provided by the Tewksbury Fire Department Tower "would be redundant with T-Mobile's existing site and would not provide coverage for the significant gap." (Docket Entry # 43, ¶¶ 38, 39) (Docket Entry # 45, p. 12).

During the hearing, abutter Logan opposed the Application and raised his concern about a proposal a few years ago "that involved rezoning the [Proposed Site] to a mixed residential/business zone." (Docket Entry # 43, ¶ 80) (Docket Entry # 45, pp. 25-26) (Docket Entry # 48-1, p. 201). "The Town did not offer any expert testimony concerning the design or safety of the proposed facility during the hearing." (Docket Entry # 43, ¶ 81) (Docket Entry # 45, p. 26).

Various Board members at the hearing also voiced their opposition to the Application. (Docket Entry # 43, ¶ 82) (Docket Entry # 45, p. 26) (Docket Entry # 48-1, p. 201). Board Member Loud stated that the Proposed Facility "was too close to the railroad tracks, adjacent building and residential abutters" as well as not safe. (Docket Entry # 43, ¶ 83) (Docket Entry # 45, p. 26) (Docket Entry # 48-1, p. 201). Board Member Barletta agreed with Board Member Loud. (Docket Entry # 43, ¶ 84) (Docket Entry # 45, p. 27) (Docket Entry # 48-1, p. 201). Board Member "Siracusa wanted to know how the Proposed Facility would benefit the Town." (Docket Entry # 43, ¶ 85) (Docket Entry # 45, p. 27). Board Member "Santini stated that granting the Application was not in the best interest of the Town or residential abutters." (Docket Entry # 43, ¶ 86) (Docket Entry # 45, p. 27).

Board Member "Santini then made a motion to deny the requested Special Permit because the Application did not meet the criteria of § 6.8 of the [Town's Zoning] Bylaw [because] the Proposed Facility was too close to the lot line, railroad tracks, abutting property, and residential zone." (Docket Entry # 43, ¶ 87) (Docket Entry # 45, p. 28) (Docket Entry # 48-1, p. 203). The Board members "voted unanimously to deny the Application because it did not meet the criteria of the [Town's Zoning] Bylaw." (Docket Entry # 43, ¶ 88) (Docket Entry # 45, p. 28) (Docket Entry # 48-1, p. 203).

The Board denied the application in two separate, similar decisions, one for Eco-Site's request for dimensional variances ("the Variance Denial") and the other for Eco-Site's request for a special permit ("the Special Permit Denial") (collectively "the Denial"). (Docket Entry # 43, ¶ 66) (Docket Entry # 45, p. 21) (Docket Entry # 48-1, pp. 207, 209, 213, 215). The Variance Denial notes that Eco-Site is seeking variances from sections 6.8.5.2 and 6.8.5.3 of the Town's Zoning Bylaw and states that:

> To acquire a variance from the Zoning Bylaw Wireless
> Communications Facilities §6.8.5.2 – facilities shall be
> located a minimum of 500 feet from an existing residential
> dwelling or proposed dwelling . . . located within a
> residential district (the [P]roposed [F]acility is less
> than 500 feet from the residential zones on First Avenue
> and North Street) and §6.8.5.3 – monopoles shall be set
> back from the property lines of the lot on which it is
> located by a distance equal to the overall vertical height
> of the monopole and any attachments plus five feet (the

15

proposed structure is 17 feet from the side lot line and 90
feet from the rear lot line abutting the railroad tracks).

(Docket Entry # 48-1, p. 207).  After reciting the hearing

minutes, the Variance Denial then states:  "[Board member

Santini] made a motion to deny the variances for the reasons

stated, too close to lot line, railroad tracks, abutting

property, residential zone . . . [t]herefore, the Board, having

considered the matter, a motion was made to deny the petition."

(Docket Entry # 48-1, p. 209).  The Variance Denial then lists

each of the Board members and his or her respective "No" votes.

(Docket Entry # 48-1, p. 209).  Next to each "No" reads:

"Reasons for denial; As stated above."  (Docket Entry # 48-1, p.

209).

The Special Permit Denial contains a similar recitation of

the hearing minutes before stating:

> Therefore, the Board, having considered the matter, [Board
> Member] Jacquelyn Santini made a motion to deny the Special
> Permit under §6.8, does not meet the criteria of the
> [Town's Zoning] Bylaw.  Each member was present and voted
> in the following way . . ..

(Docket Entry # 48-1, p. 215).  Like the Variance Denial, the

Special Permit Denial then lists each of the Board members and

his or her votes along with the reason for denial next to each

"No" vote, namely, "Does not meet criteria of Bylaw."  (Docket

Entry # 48-1, p. 215).  The Board "admits that its Decision does

not make specific mention of the purported 'service gap' in

coverage or the proposed facility itself." (Docket Entry # 45, p. 29).

"Plaintiffs filed their complaint on February 23, 2017, and alleged that the Town's denial of the Application was not based on substantial evidence and effectively prohibits the provision of personal wireless services." (Docket Entry # 43, ¶ 92) (Docket Entry # 45, p. 29) (Docket Entry # 1). Defendants filed an answer "on March 21, 2017, and included as an affirmative defense that Plaintiffs, 'failed to exhaust alternative site proposals for the installation of the proposed telecommunications tower at issue.'" (Docket Entry # 43, ¶ 93) (Docket Entry # 45, p. 30) (Docket Entry # 15). The answer also includes an affirmative defense referencing "'the location of an already existing tower which appears to fulfill the applicant's alleged reception gap without the required variances needed to locate on the [Proposed Site].'" (Docket Entry # 43, ¶ 94) (Docket Entry # 45, p. 30) (Docket Entry # 15). "The Town, however, state[s] in its Answers to Interrogatories that it is unaware of any potential alternative sites that could remedy T-Mobile's significant gap in service." (Docket Entry # 43, ¶ 95) (Docket Entry # 45, p. 31) (Docket Entry # 43-4, p. 3).

"The Town admitted in its Answers to Interrogatories that it did not conduct an independent investigation into T-Mobile's significant gap in service." (Docket Entry # 43, ¶ 96); (Docket

Entry # 45, p. 31) (Docket Entry # 43-4, pp. 5-6).  "The Town has not identified any expert who will testify about T-Mobile's significant gap."  (Docket Entry # 43, ¶ 97) (Docket Entry # 45, p. 31).

DISCUSSION

As discussed above, plaintiffs contend that the Board's denial of the Application violates section 332(c)(7)(B) of the TCA "because it is not supported by substantial evidence in the record and because it effectively prohibits T-Mobile from providing personal wireless service."  (Docket Entry # 42, p. 6).  Accordingly, they ask that this court grant the summary judgment motion "and order the Town to immediately issue all necessary permits and approvals."  (Docket Entry # 42, p. 7).  This court will first discuss the overlay of the state and local zoning laws at issue as well as the TCA before proceeding to plaintiffs' "substantial evidence" argument.  This court will then address plaintiffs' "effective prohibition" argument and the appropriate remedy, if any.

I.   State and Local Zoning Laws

As explained by the court in American Towers LLC v. Town of Shrewsbury, Civil Action No. 17-10642-FDS, 2018 WL 3104105, at *5 (D. Mass. June 22, 2018) ("American Towers"),[7] "[t]he

---

[7]  The American Towers case, discussed in detail below, involved similar parties, including T-Mobile, and similar facts

Massachusetts Zoning Act authorizes individual cities and towns to pass zoning bylaws, and describes the limits of that authority and the manner in which it may be exercised." See Mass. Gen. Laws ch. 40A, §§ 1 et seq. "The [Massachusetts] Zoning Act allows towns to regulate the maximum and minimum dimensions of structures and lots allowed in certain zoned areas." American Towers, 2018 WL 3104105, at *5. "It also allows towns to regulate the uses to which land in a given area may be put." Id. "A town's zoning ordinance or bylaw may provide that a particular use is allowed in an area, allowed only by special permit, or not allowed at all." Id.

"Where a use is allowed in a district by special permit, an applicant can seek such a permit from the board of appeals or the special permit granting authority." Id. The Massachusetts Zoning Act provides that "[s]pecial permits may be issued only for uses which are in harmony with the general purpose and intent of the ordinance or by-law, and shall be subject to general or specific provisions set forth therein; and such permits may also impose conditions, safeguards and limitations on time or use." Mass. Gen. Laws ch. 40A, § 9. Consistent with the Massachusetts Zoning Act, section 10.5 of the Town's Zoning Bylaw generally provides that a special permit:

surrounding the denial of an application to construct a wireless telecommunications communications facility.

may be authorized only where, after notice and a public
hearing, [the Board] or Planning Board specifically finds:

> That the proposed use is in harmony with the general
> purpose and intent of [the Town's Zoning] Bylaw; and

> That the use complies with all the requirements of
> [the Town's Zoning] Bylaw.

(Docket Entry # 48-1, p. 179). Relevant here, section 6.8 of
the Town's Zoning Bylaw provides special rules and requirements
for the granting of special permits for "Wireless Communications
Facilities."

"Where a particular use is not allowed in a district, a
town's permit-granting authority nevertheless has the power to
grant a variance." American Towers, 2018 WL 3104105, at *5;
Mass. Gen. Laws ch. 40A, § 10. The Massachusetts Zoning Act
provides that the permit granting authority may grant:

> with respect to particular land or structures a variance
> from the terms of the applicable zoning ordinance or by-law
> where such permit granting authority specifically finds
> that owing to circumstances relating to the soil
> conditions, shape, or topography of such land or structures
> and especially affecting such land or structures but not
> affecting generally the zoning district in which it is
> located, a literal enforcement of the provisions of the
> ordinance or by-law would involve substantial hardship,
> financial or otherwise, to the petitioner or appellant, and
> that desirable relief may be granted without substantial
> detriment to the public good and without nullifying or
> substantially derogating from the intent or purpose of such
> ordinance or by-law.

Mass. Gen. Laws ch. 40A, § 10. Consistent with the
Massachusetts Zoning Act, the Town's Zoning Bylaw generally
allows variances. Specifically, section 10.6 provides:

A variance from the specific requirements of the [Town's Zoning] Bylaw, except a variance authorizing a use or activity not otherwise permitted in a particular zoning district, may be authorized by the [Board] only where, after notice and a public hearing, the [Board] specifically finds:

That there are circumstances relating to the soil conditions, shape or topography which especially affect the land or structure in question, but which do not effect[] generally the zoning district in which the land or structure is located;

That due to those circumstances especially affecting the land or structure, a literal enforcement of the provisions of [the Town's Zoning] Bylaw would involve substantial hardship, financial or otherwise to the petitioner or appellant;

That desirable relief may be granted without nullifying or substantially derogating from the intent or purpose of this Bylaw; and

That desirable relief may be granted without substantial detriment to the public good.

(Docket Entry # 48-1, p. 181). Notably, under the Massachusetts Zoning Act and the Town's Zoning Bylaw, a variance may be granted where there are "circumstances relating to the soil conditions, shape, or topography of such land" where "a literal enforcement" of the Town's Zoning Bylaw "would involve substantial hardship, financial, or otherwise" to the applicant.

II. The TCA

"Overlaid on top of state and local zoning laws are the requirements of the [TCA]." American Towers, 2018 WL 3104105, at *6. As explained by the First Circuit, the TCA represents "'an exercise in cooperative federalism . . . [that] attempts,

subject to five limitations, to preserve state and local authority over the placement and construction of [telecommunications] facilities.'" Green Mountain Realty Corp. v. Leonard, 750 F.3d 30, 38 (1st Cir. 2014) ("Green Mountain II") (quoting Nat'l Tower, LLC v. Plainville Zoning Bd. of Appeals, 297 F.3d 14, 19 (1st Cir. 2002)). It provides, among other things, as follows:

> (i) The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof--
>
> > (I) shall not unreasonably discriminate among providers of functionally equivalent services; and
> >
> > (II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.
>
> (iii) Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

47 U.S.C. § 332(c)(7)(B)(i),(iii). These federal provisions preempt state and local laws to the extent they conflict. Brehmer v. Planning Bd. of Wellfleet, 238 F.3d 117, 121-22 (1st Cir. 2001).

The TCA also provides that other than the enumerated limitations, "nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities." 47

U.S.C. § 332(c)(7)(A). Overall, the TCA "attempts to reconcile the goal of preserving local authority over land use with the need 'to facilitate nationally the growth of wireless telephone service.'" Second Generation Properties, L.P. v. Town of Pelham, 313 F.3d 620, 631 (1st Cir. 2002) (quoting Town of Amherst v. Omnipoint Commc'ns Enters., Inc., 173 F.3d 9, 13 (1st Cir. 1999)).

III. Substantial Evidence

A. Substantial Evidence Standard

The TCA sets out two requirements when a local zoning authority denies an application to construct a wireless facility: the authority's decision must be (1) "in writing" and (2) "supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii). In this case, there is no dispute that the Board's decision satisfied the "in writing" requirement. The issue, rather, is whether the Board's decision was "supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii).

In order to comply with the TCA, the reasons for denying an application "need not be elaborate or even sophisticated, but rather . . . simply clear enough to enable judicial review." T-Mobile South, LLC v. City of Roswell, 135 S. Ct. 808, 815 (2015) ("Roswell"). Courts recognize that "local authorities are frequently lay member boards without many resources" and

consequently "do not require formal findings of fact or conclusions of law." Nat'l Tower, 297 F.3d at 20-21. "Nor need a board's written decision state every fact in the record that supports its decision." Id. at 21. "'Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" taking into account "'contradictory evidence in the record.'" Green Mountain Realty Corp. v. Leonard, 688 F.3d 40, 50 (1st Cir. 2012) ("Green Mountain I") (internal citations omitted).

However, "a board must provide the reasons for its decision; merely reciting the bylaw is insufficient to comply with the substantial-evidence requirement." American Towers, 2018 WL 3104105 at *7; see, e.g., T-Mobile Northeast LLC v. City of Lawrence, 755 F. Supp. 2d 286, 291 (D. Mass. 2010) ("mere recitation of provisions of a local zoning ordinance does not constitute 'substantial evidence' under the Act"); Sprint Spectrum L.P. v. Town of Swansea, 574 F. Supp. 2d 227, 236 (D. Mass. 2008) (holding that the zoning board could not "ignore the requirements of the TCA by parroting Swansea's Zoning By-Law"); Nextel Communications of Mid-Atlantic, Inc. v. Town of Randolph, 193 F. Supp. 2d 311, 318 (D. Mass. 2002) (criticizing zoning board's decision as "pabulum" and "conclusory statements") ("Nextel Communications"); see also MCF Communications, LLC v. Town of Portsmouth, 2012 WL 6706935, at *2 ("[c]onclusory

statements" insufficient to meet TCA's "written denial requirement").

In determining whether a decision is supported by substantial evidence, the reviewing court must consider the written record as a whole and is limited to the administrative record before the board.[8] Green Mountain I, 688 F.3d at 50-51; Nat'l Tower, 297 F.3d at 22. The written record may include more than the writing that conveys the denial if the "reasons are sufficiently clear and are provided or made accessible to the applicant essentially contemporaneously with the written denial letter or notice." Roswell, 135 S. Ct. at 811-12

B.    Whether Town Violated Substantial Evidence Standard

Plaintiffs do not contest that the Denial is in writing; rather, they challenge the reasons articulated in the Denial as unsupported by substantial evidence in violation of section 332(c)(7)(B)(iii) of the TCA. (Docket Entry # 42, pp. 17-29). In their estimation, the Denial contains "at best" three reasons for denying the Application: "(1) safety concerns due to the proximity of the Proposed Facility to other structures; (2) a lack of evidence as to how the Proposed Facility would benefit the Town; and (3) the [Board's] opinion that construction of the

_____

[8]  Because the Conroy Report is not part of the administrative record, it is not considered with respect to the substantial evidence assessment.

Proposed Facility was not in the best interest of the Town or the residential abutters.'"[9]  (Docket Entry # 42, pp. 17-18). Plaintiffs argue that "these reasons are either not supported by substantial evidence in the written record or are not valid reasons for denying the Application under the Town's Zoning Bylaw" and therefore cannot be grounds for denial that constitutes substantial evidence.  (Docket Entry # 42, p. 18). Plaintiffs contend that "[u]nder the substantial evidence standard, localities may not deny applications for reasons not set forth in their own zoning bylaw."  (Docket Entry # 42, p. 17).

First, plaintiffs maintain that the concerns raised by the Board regarding safety are directly contradicted by the expert evidence contained in the Fall Zone Letter.  Specifically, they reason that "[t]he Fall Zone Letter describe[s] how the Proposed Facility could be designed so that it present[s] no danger to the surrounding facilities and structures," and there is no contradictory expert or technical evidence.  (Docket Entry # 42, pp. 18-19).  Thus, plaintiffs submit that by ignoring "'the only available expert [report] on the issue,'" "[t]he Board violated

---

[9]  The Special Permit Denial and the Variance Denial each state while summarizing the hearing minutes that "[Board Member] Santini agreed that this was not in the best interest of the Town or the residential abutters."  (Docket Entry # 48-1, p. 213) (Docket Entry # 48-1, p. 209).

the substantial evidence requirement."[10]  (Docket Entry # 42, p. 19).

Second, plaintiffs argue that the remaining reasons contained in the Denial, i.e., that plaintiffs "failed to show how the Proposed Facility would benefit the Town and that granting the Application was not in the Town's best interest, are not supported by substantial evidence because they are not valid reasons for denying the Application under § 6.8 of the Town's Zoning Bylaw."  (Docket Entry # 42, pp. 19-20). Specifically, they contend that "[t]he general purpose of section 6.8," as expressed in section 6.8.1,[11] does not require "applicant[s] to present evidence illustrating how the Town would benefit from the [Proposed Facility]," nor does any other section of the Town's Zoning Bylaw.  (Docket Entry # 42, p. 20). Plaintiffs note that although "section 6.8.7.3[12] allows the Board

---

[10]  In addition, plaintiffs assert that "[a] local government cannot substitute the members' lay opinion to contradict expert evidence on technical issues."  (Docket Entry # 42, p. 19).

[11]  Section 6.8.1 of the Town's Zoning Bylaw provides:

> The purpose of these regulations is to minimize adverse impacts of wireless communications facilities, satellite dishes and antennas on adjacent properties and residential neighborhoods; minimize the overall number and height of such facilities to only what is essential; and promote shared use of existing facilities to minimize the need for new facilities.

(Docket Entry # 48-1, p. 119).

[12]  Section 6.8.7.3 of the Town's Zoning Bylaw states:

27

to take into consideration 'the proximity of the facility to
residential dwellings and its impact on those residences,' but
the Town's Denial does not assert that the Proposed Facility
would have an adverse impact on nearby residences," and
regardless, plaintiffs "submitted evidence that demonstrated
that there were not legitimate safety concerns." (Docket Entry
# 42, p. 20). Plaintiffs further argue that "[t]he Board
members' opinions that the Proposed Facility was not in the
Town's best interest and that Eco-Site had failed to show how it
would benefit the Town are separate and distinct from any
argument about the proximity of the Proposed Facility to
residential dwellings." (Docket Entry # 42, p. 20). Thus,
plaintiffs assert that the Denial is not supported by
substantial evidence because "[i]t is well-established that
local government denials are not supported by substantial
evidence when they are based on factors that are not applicable
under the local code." (Docket Entry # 42, p. 20).

---

> When considering an application for a wireless
> communications facility, the [Board] shall take into
> consideration the proximity of the facility to residential
> dwellings and its impact on these residences. New
> facilities shall only be considered after a finding that
> existing (or previously approved) wireless communication
> facilities suitable for and available to the applicant on
> commercially reasonable terms cannot accommodate the
> proposed uses(s), taking into consideration radio frequency
> engineering issues and technological constraints.

(Docket Entry # 48-1, p. 127).

Third, plaintiffs argue that failure to give consideration to the TCA "alone is sufficient for the Court to enter summary judgment in Plaintiffs' favor," as "failure to consider the possibility that enforcement of zoning bylaws *may* violate the [TCA] automatically renders a decision not based on substantial evidence and in violation of the [TCA]." (Docket Entry # 42, p. 21). They maintain that "a significant gap in wireless coverage is considered a unique circumstance that would cause substantial hardship to an applicant if the variance is not granted," and, moreover, "[t]he law is clear that the [TCA] 'preempts state and local laws when the application of those laws effectively violates one of the [TCA's] enumerated limitations on state zoning authority.'" (Docket Entry # 42, p. 21).

As an initial matter and contrary to plaintiffs' assertion, it is not a foregone conclusion that a zoning board's failure to "give consideration" to the TCA "automatically renders a decision not based on substantial evidence and in violation of the [TCA]." (Docket Entry # 42, p. 21). Notably, while plaintiffs rely on Nextel Communications, 231 F. Supp. 2d at 404, that decision has been questioned by at least one court in this district and is not supported by other First Circuit cases.

In Nextel Communications, the plaintiff sought a dimensional variance from the Town of Wayland in order to build a wireless telecommunications facility. Nextel Communications,

231 F. Supp. 2d at 398. The zoning board denied the variance, explaining that "'[t]he hardship alleged by the applicant is related to its business plan of providing a certain amount of wireless coverage to the Town, rather than to the unique shape or topography of the Locus.'" Id. at 407. The court, however, criticized the zoning board for failing to explain how the plaintiff would be able to provide sufficient coverage without the variance and ultimately held that the zoning board failed to give "due consideration" to the TCA such that the denial was not supported by substantial evidence:

> Under the Telecommunications Act, the Board cannot deny the variance if in doing so it would have the effect of prohibiting wireless services. 47 U.S.C. § 332(c)(7)(B)(i)(II). In other words, the need for closing a significant gap in coverage, in order to avoid an effective prohibition of wireless services, constitutes another unique circumstance when a zoning variance is required . . .. The Board's decision, particularly the second step in its analysis, fails to give due consideration to the requirements of the [TCA]. The Board's reasoning involved incorrect legal conclusions, which led to the incorrect factual conclusion that no unique circumstances existed that would require a zoning variance. The decision, therefore, is not supported by substantial evidence and in violation of [section] 332(c)(7)(B)(iii) [of the TCA].

Id. at 406-407.

In American Towers, however, the court held that the TCA does *not* require a zoning board, when denying a particular application, to determine expressly whether that denial is an effective prohibition of service. American Towers, 2018 WL

3104105, at *8.[13]  There, the plaintiffs, American Towers LLC and

T-Mobile, proposed to build a wireless telecommunications tower

at a location in a zoning district that prohibited such

construction.  Id. at *1.  The town's zoning board of appeals

denied the plaintiffs' application for a variance from the

town's zoning bylaw, and the plaintiffs filed a complaint

asserting that the zoning board of appeals' denial effectively

prohibited wireless service and was not supported by substantial

evidence contained in a written record.[14]  Id.  In considering

whether the zoning board was required to give consideration to

the TCA, the court determined that the zoning board of appeals

"need only evaluate the application for a zoning variance under

the applicable standard as provided by state and local law."

Id. at *8.  Principally, the court noted that while "the

statutory text of the TCA" clearly dictates certain

requirements, including that a denial be supported by

substantial evidence and not effectively prohibit wireless

service, it does not likewise indicate that any one of those

requirements "is connected to or dependent on any of the

others."  Id. at *9.  Instead, the court stated that the

---

[13]  In reaching that conclusion, the court explicitly stated that
it disagreed with the Wayland court.  American Towers, 2018 WL
3104105 at *11.
[14]  The plaintiffs moved for summary judgment on the "substantial
evidence" issue only, so the court did not address their
"effective prohibition" claim.  Id.

requirement that a town's decision be supported by substantial evidence is merely a requirement intended to permit effective judicial review, not a "standard for granting a variance." Id. at *9. The court then noted:

> incorporating a duty to consider an effective-prohibition claim into the substantial-evidence requirement of the TCA seems to clash with the overall regulatory scheme. The two different types of claims (that is, effective prohibition and failure to provide substantial evidence) are judged according to different standards, and on a different record.

Id. at *11.

Examining the statutory text of the TCA, this court agrees with the American Towers court that the substantial evidence requirement and ban on effective prohibition are two separate requirements. Section 332(c)(7)(B) clearly proscribes five separate limitations on state and local zoning authorities in subparagraphs (i) through (v), including that a decision be supported by substantial evidence and not result in the "'effective prohibition of wireless service,'" and there is nothing within the statute indicating that these requirements are meant to be read together or as dependent on one another. American Towers, 2018 WL 3104105, at *8. Moreover, and as the American Towers court noted, the First Circuit has indicated that a zoning board need not consider whether its decision amounts to an "'effective prohibition'"; rather, the appropriate standard for evaluating whether substantial evidence supports a

zoning board's decision is the relevant state and local standards for granting a variance or special permit. Id. at *9; see Second Generation Props., 313 F.3d at 630 ("TCA does not itself expressly authorize local zoning boards to consider whether individual decisions amount to an 'effective prohibition'"); ATC Realty, LLC v. Town of Kingston, 303 F.3d 91, 94 (1st Cir. 2002) ("'TCA's substantial evidence test is a procedural safeguard which is centrally directed at whether the local zoning authority's decision is consistent with the applicable zoning requirements'") (internal citations omitted); Southwestern Bell Mobile Systems, Inc. v. Todd, 244 F.3d 51, 58 (1st Cir. 2001) ("'Substantial evidence' review under the TCA does not create a substantive federal limitation upon local land use regulatory power, but is instead 'centrally directed to those rulings that the Board is expected to make under state law and local ordinance in deciding on variances, special exceptions, and the like.'") (internal citation omitted), abrogated on other grounds by T-Mobile S., LLC v. City of Roswell, 135 S.Ct. 808 (2015) ; Amherst, 173 F.3d at 14 (noting that substantial evidence requirement "surely refers to the need for substantial evidence *under the criteria laid down by the zoning law itself*"); see also Tower and Wireless, LLC v. Haddad, 109 F. Supp. 3d 284, 299 (D. Mass. 2015) (overturning zoning board's decision because it was based only on effective

prohibition prong of TCA and failed to apply standard in local zoning bylaw).

Here, the Board's Denial consisted of two separate written decisions: the Variance Denial and the Special Permit Denial. Although plaintiffs acknowledge that the Denial consisted of two separate decisions, their briefs do not likewise evaluate each decision on its own to determine whether either was supported by substantial evidence. Thus, in claiming that the Denial was not supported by substantial evidence, they appear to conflate the special permit and variance standards. The Board appears to have done the same, which, if this court were to follow American Towers, is grounds on its own to find that the Variance Denial was not supported by substantial evidence. See American Towers, 2018 WL 3104105, at *12; cf. Haddad, 109 F. Supp. 3d at 298 (local zoning board's denial of application for a special permit to build a wireless telecommunications tower was not supported by substantial evidence where zoning board applied wrong legal standard). In American Towers, the plaintiffs argued that the zoning board's written "decision merely parroted" the town's zoning bylaw "without offering any supporting facts or analysis." American Towers, 2018 WL 3104105, at *12. The court, inclined to agree, noted that the zoning board's written decision was "worse than a mere parrot of the standard." Id. The decision, which purported to address the plaintiffs'

application for variances, parroted "both the variance standard, without any further explanation, *and* the special permit standard," which was not relevant. Id.

Here, plaintiffs requested both a special permit and dimensional variances, and the Board addressed each in the two separate decisions. However, like the board in American Towers, the Board appears to conflate the special permit and variance standards under the Massachusetts Zoning Act and the Town's Zoning Bylaw, or else ignores the state and local variance standards altogether. As discussed previously, section 10.5 of the Town's Zoning Bylaw provides that a special permit for a particular use may be authorized only where the Board specifically finds that the proposed use is in harmony with the general purpose and intent of the Town's Zoning Bylaw and complies with all the requirements of the Town's Zoning Bylaw. Section 8.6 provides the specific rules and requirements for granting a special permit for a wireless communications facility. On the other hand, section 10.6 outlines the standard for granting a variance from the specific requirements of the Town's Zoning Bylaw, including the requirements for granting a special permit for a wireless communication facility like the Proposed Facility. The Variance Denial, however, merely acknowledges that the plaintiffs are requesting variances from sections 6.8.5.2 and 6.8.5.3 before providing a rote recitation

of the hearing minutes where the board members and residential abutters expressed their various concerns regarding the Proposed Facility. The Variance Denial then identifies the specific reasons as follows: "too close to the lot line, railroad tracks, abutting property, residential zone." (Docket Entry # 48-1, p. 209). However, similar to the zoning board in American Towers, the Board, in identifying these "reasons," merely recites the various requirements set forth in section 6.8 for granting a special permit for wireless communications facilities. Unlike the zoning board in American Towers, which at least parroted the applicable variance standard under the town's zoning bylaw, the Board fails to even parrot the applicable zoning standard. Beyond the rote acknowledgement that plaintiffs need variances from the special permit requirements in section 6.8, the Board's decision does not mention section 10.6 and the applicable variance standard under the Town's Zoning Bylaw or, namely, any topographical feature or hardship.

For the above reasons, this court is inclined to find that the Variance Denial is not supported by substantial evidence. However, plaintiffs do not make the specific argument that the Board conflated the variance and special permit standards or else ignored the applicable variance standard, and this court declines to raise it sua sponte and overturn the Board's

decision on this issue at this juncture.  Rather, plaintiffs
argue more broadly that the "sole reason the Board voted against
the Application was because they felt it was unsafe due to its
proximity to other structures on abutting property."  (Docket
Entry # 42, p. 13).

Notwithstanding plaintiffs' theory, this court interprets
the Board's reasons for denying the Application, as expressed in
both the Variance Denial and Special Permit Denial, as being
directly related to the Proposed Facility failing to meet the
requirements in section 6.8 for granting a special permit for a
wireless communications facility.  As defendants point out,
section 6.8.7.1 of the Town's Zoning Bylaw provides that
"'[a]pplications for Special Permits shall be approved or
approved with conditions *if* the petitioner can fulfill the
requirements of these regulations to the satisfaction of the
Board of Appeals.'"  (Docket Entry # 49, p. 10) (Docket Entry #
48-1, p. 127).  Thus, the Board may deny an application for a
special permit to construct a wireless communications facility
if the proposed facility fails to meet any of the requirements
in section 6.8, including sections 6.8.5.2 and 6.8.5.3.  Section
6.8.5.3, however, also provides in relevant part that a
monopole:

> shall be set back from the property lines of the lot on
> which it is located by a distance equal to the overall
> vertical height of the monopole and any attachments plus

> five feet, *unless the applicant demonstrates that due to*
> *topography and/or other characteristics of the site lesser*
> *setbacks shall not pose any public safety danger to any*
> *adjacent properties.*

(Docket Entry # 48-1, p. 123) (emphasis added).

Plaintiffs argue that the Board ignored uncontroverted evidence that the Proposed Facility was safe. As a general matter, it is true that a zoning board may not ignore uncontroverted expert testimony. See <u>City of Lawrence</u>, 755 F. Supp. 2d at 292 (finding that the zoning board "improperly ignored the only available expert testimony on the issue" of whether a coverage gap existed. The appropriate standard for evaluating whether substantial evidence supports a zoning board's decision, as discussed previously, is the relevant state and local standard for granting a variance or special permit. Here, the language in section 6.8.5.3 of the Town's Zoning Bylaw, as allowed by the Massachusetts Zoning Act, indicates that to avoid the specified setback requirement, an applicant must demonstrate that "*due to topography and/or other characteristics of the site* lesser setbacks shall not pose any public safety danger to any adjacent properties." (Docket Entry # 48-1, p. 123) (emphasis added). Plaintiffs rely on the Fall Zone Letter to show that the *design* of the Proposed Facility will not pose any public safety danger to any adjacent properties; however, section 6.8.5.3 speaks to topographic and

other characteristics of the *site* and makes no mention of the characteristics or features of the actual wireless facility. Thus, the fact that the Board ignored uncontroverted evidence demonstrating that the Proposed Facility was safe does not amount to the Special Permit Denial being unsupported by substantial evidence.

Although this court is hesitant to stretch plaintiffs' argument further to directly challenge the Board's apparent disregard or misunderstanding of the applicable variance standard in the Variance Denial, this court need not and does not make a determination as to whether the Variance Denial (and the Denial) is supported by substantial evidence because the Denial nevertheless effectively prohibits wireless service in violation of the TCA. See Green Mountain II, 750 F.3d at 38 ("It is well-established in this Circuit that 'local zoning decisions . . . that prevent the closing of significant gaps in the availability of wireless services violate the statute.' This is true even where a local authority's denial of an individual application pursuant to its own local ordinances is supported by substantial evidence.") (quoting Nat'l Tower, 297 F.3d at 19-20).

IV.  Effective Prohibition

As discussed previously, the TCA does not require a zoning board or other local authority to consider whether its decision

39

constitutes an effective prohibition of wireless service.
However, that does not mean that a zoning board's choice to
ignore evidence of a gap in coverage is insignificant. <u>Second
Generation Props.</u>, 313 F.3d at 630 (noting that although TCA
does not itself expressly authorize local zoning boards to
consider whether individual decisions amount to an effective
prohibition, "many boards wisely do consider the point");
<u>American Towers</u>, 2018 WL 3104105, at *8 ("[a] local zoning board
thus ignores evidence of a gap in coverage at its peril").

Indeed, regardless of whether a zoning board or other local
authority determines expressly whether a decision is supported
by substantial evidence,[15] a plaintiff may prove an "effective
prohibition" claim by demonstrating that: (1) "a 'significant
gap' in coverage exists;" and (2) the proposed plan, which the
local authority rejected, is the "'only feasible plan.'"
<u>Omnipoint Holdings, Inc. v. City of Cranston</u>, 586 F.3d 38, 48,
50 (1st Cir. 2009). Both of these determinations are "based,
not on bright-line legal standards, but on the facts in the
record." <u>Omnipoint Holdings</u>, 586 F.3d at 48; <u>see Green Mountain</u>

---

[15] The First Circuit explicitly states that "[t]he question of
whether or not a local denial constitutes an effective
prohibition violative of the [TCA] is definitely answered by the
district court, not the local zoning authority." <u>Green Mountain
II</u>, 750 F.3d at 38-39. Moreover, "where a local authority
purports to pass upon the issue, the federal courts afford it
'[n]o special deference.'" <u>Id.</u> at 39 (citations omitted)).

II, 750 F.3d at 38-39 ("question of whether or not a local denial constitutes an effective prohibition" is largely fact-driven). "An effective prohibition claim asserts that the decision, even if supported by the evidence, has an impermissible effect, and thus the district court considers the questions de novo, taking, it if it chooses, additional evidence not in the administrative record." Green Mountain I, 688 F.3d at 59 n.14; see, e.g., Second Generation Props., 313 F.3d at 626-627) (affirming summary judgment for town where district court considered both the record developed before the local board and "other evidence submitted by the parties in support of their motions").[16]

A.  Existence of Significant Gap in Coverage

Plaintiffs argue that they established the existence of a significant gap in coverage. Specifically, they assert that propagation maps and analysis by RF engineers are sufficient to show the existence of a gap in this circuit. They further point out, correctly, that defendants "did not dispute the existence of the gap at the hearing and admitted that [they] did not conduct any independent investigation into the issue." (Docket Entry # 42, p. 24). It is true that defendants do not contest that plaintiffs have established a significant gap in coverage

---

[16]  It is therefore appropriate to consider the Conroy Report in determining effective prohibition.

exists in the Town in the vicinity of the Proposed Site.[17]

"However, because it is plaintiffs' burden, as the provider, to

---

[17] As plaintiffs point out, defendants' only "response on the Effective Prohibition claim appears to be that the denial was supported by its local zoning bylaw." (Docket Entry # 50, p. 9). Specifically, defendants assert:

> The town's zoning bylaws and the Board's decision do not prohibit cell towers within the [T]own nor do they violate the 'effective prohibition' sections of the [TCA. In order to succeed on an effective prohibition claim, the applicants must establish: (1) that the [T]own's zoning policies and decisions result in a significant gap in wireless service within the town; and (2) that 'from language or circumstances not just that [their] application has been rejected but that further reasonable efforts are so likely to be fruitless that it is a waster [sic] of time even to try.'

(Docket Entry # 49, p. 5) (internal citations and footnote omitted). Defendants then go on to explain:

> However, it must be remembered that . . . 47 U.S.C. § 332(c), which relates to the preservation of local zoning authority, provides that '[e]xcept as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.' 47 U.S.C. § 332(c)(1996). The statutory general reservation of the right of local authorities to govern the sitting and construction of telecommunications facilities is subject only to the limitations which follow in 47 U.S.C. § 332(c)(7)(B) which preclude such exercise of authority to the extent that it 'unreasonably discriminate[s] among providers of functionally equivalent services' and/or 'prohibit[s] or have the effect of prohibiting the provision of personal wireless services.' 47 U.S.C. § 332(c)(7)(B)(1996). Here no such prohibition has been shown as no such prohibition has occurred.

(Docket Entry # 49, pp. 5-6). Beyond this paragraph, defendants do not adequately explain why the Town's Zoning Bylaw and the Board's decision do not constitute an effective prohibition in violation of the TCA. (Docket Entry # 46). Moreover, and as

demonstrate both elements of an effective prohibition claim, this court will address the evidence regarding the existence of a significant gap in services." See T-Mobile Ne., LLC v. Town of Bedford, No. 17-CV-339-LM, 2018 WL 6201717, at *6 (D.N.H. Nov. 28, 2018) (citing City of Cranston, 586 F.3d at 48 ("'carrier has the burden to show an effective prohibition has occurred'")).

The "significant-gap analysis" focuses on "'whether a coverage problem exists at all.'" City of Cranston, 586 F.3d at 48-49 (citing Second General Props. 313 F.3d at 631). Defendants contend that the analysis is concerned "with complete coverage of wireless services within a town, not significant gaps in a particular provider's coverage." (Docket Entry # 46, p. 3, n.3). As plaintiffs point out, however, the First Circuit rejects that test and holds that the relevant question is whether a significant gap exists within the individual carrier's network. City of Cranston, 586 F.3d at 49 ("We have rejected the Third Circuit's rule that considers not the individual carrier's network but whether any carrier provides service to an area."). In deciding whether the coverage gap is significant,

---

plaintiffs argue, the fact that a decision comports with the local zoning law is not a defense to an effective prohibition claim because, as discussed previously, a decision may still constitute an effective prohibition regardless of whether it is supported by substantial evidence.

this court "should consider, inter alia, the physical size of
the gap, the area in which there is a gap, the number of users
the gap affects, and whether all of the carrier's users in that
area are similarly affected by the gaps." Id. at 49.

Here, plaintiffs provide sufficient undisputed evidence to
establish the existence of a significant gap in the vicinity of
Tacoma Drive.  The RF Affidavit submitted as part of the
Application states that T-Mobile "provides insufficient wireless
communication services to the Town" in the vicinity of Tacoma
Drive and is further supported by the Conroy Report.  The Conroy
Report, which utilizes propagation maps and radio frequency
data, demonstrates that there is a 2.1 square mile gap in T-
Mobile's ability to provide service in the vicinity of Tacoma
Drive "caused by a lack of reliable in-building residential &
in-building commercial coverage."  (Docket Entry # 43-1, p. 8).
The Conroy Report further demonstrates that the gap includes
residences, commercial buildings, and strip malls; and that
according to 2010 U.S. Census data, there are approximately
2,320 to 5,494 residents in the in-building coverage gap area.
This evidence cumulatively establishes that a significant gap of
coverage exists.  See Haddad, 109 F. Supp. 3d at 301 (provider
met its burden on summary judgment of establishing gap in
wireless coverage where provider provided multiple propagation
studies showing lack of service and defendants did not oppose

providers' LR. 56.1 statement or raise "any significant issues of fact in their Opposition"); accord Town of Bedford, 2018 WL 6201717, at *6 (finding that RF analysis submitted with provider's application to zoning board identifying coverage gap and expert report submitted in support of plaintiff's summary judgment motion constituted sufficient evidence of coverage gap); Nextel Commc'ns of the Mid-Atlantic, Inc. v. Town of Sudbury, Civil Action No. 01-11754-DPW, 2003 WL 543383, at *12 (D. Mass. Feb. 26, 2003) (noting that coverage maps "are commonly relied upon by wireless carriers, zoning boards, and courts to determine the extent of coverage in a given locality"). This evidence further supports a finding that the identified gap is "significant." See Branch Towers, LLC v. City of Knoxville, No. 3:15-CV-00487, 2016 WL 3747600, at *1, 6 (E.D. Tenn. July 11, 2016) (provider met burden on summary judgment of demonstrating "significant gap" in services where gap consisted of 1.5 square mile area that encompassed "residential streets, churches, a school, and several heavily traveled roads"); AT&T Mobility Servs., LLC v. Vill. of Corrales, 127 F. Supp. 3d 1169, 1174 (D.N.M. 2015) (finding sufficient evidence of "significant gap" on summary judgment where gap was approximately two miles across and much of it "include[d] a residential zone without reliable in-home coverage"), aff'd, 642 F. App'x 886 (10th Cir. 2016); cf. Town of Bedford, 2018 WL 6201717, at *7 (finding

sufficient evidence of "significant gap" on summary judgment
where RF report and "propagation maps demonstrate[d] . . . 6.7
square mile gap in" provider's reliable in-building services
encompassing "4,000 residents and three schools").

B.  Only Feasible Plan

Plaintiffs next argue that the Proposed Facility is the
only feasible means to remedy the significant gap.
Specifically, they contend that they "investigated thoroughly
the possibility of other viable alternatives" before concluding
"no other feasible locations were available."  (Docket Entry #
42, p. 25).  In making this argument, plaintiffs point to their
"good faith" efforts to identify all of the properties in the
search ring and evaluate which of the properties was feasible
for a tower.  (Docket Entry # 42, p. 7).  They further argue
that upon demonstrating that they investigated other sites and
designs and there was no other feasible plan, "the Town has the
burden to demonstrate that technically feasible and actually
available alternatives exist."  (Docket Entry # 42, p. 25).

As noted previously, defendants, in response to the
"effective prohibition" claim, only contend that "no such
prohibition has been shown as no such prohibition has occurred."
(Docket Entry # 49, pp. 5-6).  They do not explicitly address
whether the Proposed Facility is the only feasible plan and
appear to argue that an effective prohibition can only occur

where a town's zoning bylaw prohibits *all* cell towers, and not just those towers that fail to meet certain zoning requirements. While it is true that an individual denial by a zoning board does not automatically equate to an effective prohibition, the First Circuit and other courts in this district conclude that an individual denial may amount to an effective prohibition in certain circumstances, including where no alternative exists. See, e.g., American Towers, 2018 WL 3104105, at *11 (citing Amherst, 173 F.3d at 14) ("'Obviously, an individual denial is not automatically a forbidden prohibition violating the "effects" provision. But neither can we rule out the possibility that—based on language or circumstances—some individual decisions could be shown to reflect or represent, an effective prohibition on personal wireless services.'").

Defendants contend that to succeed on an effective prohibition claim, plaintiffs "must establish: (1) that the [T]own's zoning policies and decisions result in a significant gap in wireless services within the [T]own; and (2) that 'from language or circumstances not just that [their] application has been rejected but that further reasonable efforts are so likely to be fruitless that it is a waster [sic] of time even to try.'" (Docket Entry # 49, p. 5) (internal citations and footnote omitted). The First Circuit adheres to the following standard:

> Whether or not an effective prohibition has occurred
> depends on each case's unique facts and circumstances, and
> "there can be no general rule classifying what is an
> effective prohibition." Second Generation Props., 313 F.3d
> at 630. We have, however, discussed certain "circumstances
> where there is a prohibition 'in effect.'" Id. "[W]here
> the plaintiff's existing application is the only feasible
> plan . . . denial of the plaintiff's application might
> amount to prohibiting personal wireless service." Id.
> (citations and internal quotation marks omitted). In
> attempting to show that local authorities have rejected the
> only feasible plan, a carrier bears "the 'heavy' burden 'to
> show from the language and circumstances not just that *this*
> application has been rejected but that further reasonable
> efforts [to find another solution] are so likely to be
> fruitless that it is a waste of time even to try.'" City
> of Cranston, 586 F.3d at 50 (emphasis and alteration in
> original) (quoting Town of Amherst, 173 F.3d at 14).

Green Mountain II, 750 F.3d at 40 (internal quotation marks and

footnote omitted). Thus, the applicable test is the one

articulated in City of Cranston, namely, whether plaintiffs have

shown "'that further reasonable efforts . . . are so likely to

be fruitless that it is a waste of time even to try.'" City of

Cranston, 586 F.3d at 50 (internal citation omitted). In City

of Cranston, the court further explained that a carrier has the

burden to prove it "'investigated thoroughly the possibility of

other viable alternatives' before concluding no other feasible

plan was available." Id. at 52 (internal citation omitted). As

discussed previously, whether the carrier proves an effective

prohibition is a factual question for this court to resolve.

Relevant facts a court may consider in assessing whether a

provider has carried this burden include the technical

feasibility of the proposed site and any alternative plans, the overall cost of alternatives to the provider, the technological efficiency of alternatives, whether local authorities are willing to cooperate with carriers, and whether a "'town could prefer other solutions on aesthetic grounds.'" Town of Bedford, 2018 WL 6201717, at *8 (citing City of Cranston, 586 F.3d at 52). "Also relevant is the availability of alternative sites, i.e. whether owners are willing to sell or lease the land." Id. "'In order for a site to be an alternative sufficient to forestall a claim of effective prohibition, it needs to be available and technically feasible.'" Id. at *11 (internal citation omitted). "'Ultimately, the question is a practical inquiry into feasible, available alternatives.'" Id. (citing City of Cranston, 586 F.3d at 52-53).

Here, plaintiffs provided sufficient undisputed evidence to establish that the Proposed Facility is the "only feasible plan." T-Mobile RF engineers identified a search ring to remedy the coverage gap and that T-Mobile then proceeded to perform a detailed and thorough search of the area within the search ring for available properties that would be suitable for construction of a wireless telecommunications facility that would remedy the gap and comply with the Town's Zoning Bylaw. The Conroy Report shows, and defendants acknowledge, that T-Mobile expressed interest in building its facility at the Town Hall. The Town

Hall, however, was not an appropriate candidate because the Town refused to enter into a lease that would permit T-Mobile to deploy a wireless telecommunications facility at the Town Hall. Thus, the Town Hall is not a viable alternative because it is not available. It is also undisputed that T-Mobile also considered installing the wireless telecommunications facility at St. Dorothy's Church. Here again, the Conroy Report establishes that St. Dorothy's Church is not a viable option because an antenna mounted in a fashion acceptable to the Board would be at a height of approximately 50 feet above ground level, which is too low to provide substantive coverage to the gap area.[18] Thus, St. Dorothy's Church is not technically feasible. Finally, it is undisputed that T-Mobile expressed interest in 200 Jefferson Road, but the landlord of the property refused to lease the property. Thus, 200 Jefferson Road is also not a viable option because it is not available. See O'Rourke, 582 F. Supp. 2d at 110 (finding that parcel of land was "not an alternative site because the owners [were] not interested in selling the land").

After evaluating the properties within the search ring, T-Mobile determined that the Proposed Site is an appropriate site

_____

[18] Defendants do not sufficiently articulate an alternative means to show that an antenna could be mounted in a way that would both comply with the Town's Zoning Bylaw and remedy the T-Mobile's coverage gap. (Docket Entry # 46, pp. 7-8).

because it is located in a general business zone, it would
provide coverage relative to its location, it is buildable, and
the site owner agreed to lease the site. Defendants object to
T-Mobile's conclusion that the Proposed Site is an "appropriate
site" because it does not comply with the Town's Zoning Bylaw.
Where no other feasible alternatives exist, however, the fact
that a proposed plan does not comply with local zoning laws does
not defeat an effective prohibition claim.

At the Board's request, plaintiffs also considered the
Tewksbury Fire Department Tower. The Conroy Report demonstrates
that the tower is not a viable alternative because it is outside
of the search ring. In addition, it is undisputed that any
potential coverage provided by the Tewksbury Fire Department
Tower would be redundant with an existing T-Mobile site and
would not provide coverage for the significant gap. See City of
Cranston, 586 F.3d at 53 (district court did not err in finding
that fire department museum, which provided largely repetitive
coverage with another tower to solve the carrier's gap, was not
a viable alternative).

In short, the evidence cumulatively demonstrates that the
Proposed Facility is the "only feasible plan." Notably, there
is no evidence of any alternative that could remedy T-Mobile's
significant gap. Id. at 52 ("When we have held the carrier has
not met its burden, the evidence has been essentially undisputed

that the carrier had other alternatives."); id. at 53 (district court "did not clearly err" in finding that constructing a wireless telecommunications tower at proposed site "was the only feasible way" to close the carrier's coverage gap where evidence presented by the carrier showed that it "had in fact systemically searched for solutions to the gap problem using technologically reliable criteria and methodologies"); cf. Second Generation Props., 313 F.3d at 635 (carrier did not show entitlement to summary judgment because it presented no explanation why its proposal was the only feasible site); Amherst, 173 F.3d at 15 (carrier did not show entitlement to summary judgment because it "did not present serious alternatives to the town" other than the most efficient solution and "practically admitted that *somewhat* lower towers were technically feasible"). Finally, there is little, if any, reason to question the qualifications of Conroy or De Ramos, who both have extensive experience as RF engineers. (Docket Entry # 43-1, pp. 41-44) (Docket Entry # 43-2, pp. 47-53).

V. Remedy

For the above reasons, plaintiffs meet their burden of showing: (1) that a significant gap in coverage exists in the vicinity of Tacoma Drive; and (2) that the Proposed Facility is the only feasible plan that would remedy the significant gap in coverage and that further reasonable efforts to identify

alternatives are likely to be fruitless such that it would be a waste of time to try. A reasonable finder of fact would not conclude otherwise. Having sufficiently established both prongs of an effective prohibition of a matter of law, plaintiffs are entitled to summary judgment. See Town of Bedford, 2018 WL 6201717, at *12 (granting summary judgment to carrier plaintiffs where they "satisfied both prongs of their effective prohibition claim"). Conversely and separately viewing defendants' request for summary judgment in their favor under Rule 56(f)(1), defendants' request lacks merit. In addition, because plaintiffs are entitled to summary judgment, it is not necessary for this court to "consider summary judgment on its own" under Rule 56(f)(3), as requested by defendants. Having determined that the Denial effectively prohibits T-Mobile from providing wireless services in violation of the TCA, the appropriate remedy, as plaintiffs argue, is an injunction ordering the Board to issue the wrongfully withheld special permit and variances. See Nat'l Tower, 297 F.3d at 25 & n.7 (affirming district court's order instructing zoning board "'to issue within thirty (30) days . . . the dimensional and use variances and special permit necessary for the construction of the plaintiffs' 170 foot lattice tower and maintenance facility'" where board effectively prohibited provision of wireless services) (internal citation omitted); Brehmer, 238 F.3d at 120–123 (discussing and

approving decisions by majority of district courts granting injunctive relief in TCA cases); Town of Bedford, 2018 WL 6201717 at *12 ("While the TCA does not specify a remedy for a violation, where the requisite showing has been made, 'injunctive relief is the preferred remedy, given the [TCA's] stated objective of expediting judicial review.'") (citing Nat'l Tower LLC v. Frey, 164 F. Supp. 2d 185, 190 (D. Mass. 2001), aff'd sub nom. Nat'l Tower, 297 F.3d at 14)).

CONCLUSION

In accordance with the foregoing discussion, plaintiffs' motion for summary judgment (Docket Entry # 41) is **ALLOWED** and defendants' request for summary judgment under Rule 56(f)(1) (Docket Entry # 46) is **DENIED**. The Board is **ORDERED** to issue within 30 days of this Order the requested dimensional variances and special permit necessary for the construction of the Proposed Facility.

_/s/ Marianne B. Bowler_
**MARIANNE B. BOWLER**
United States Magistrate Judge